**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHRISTINE A. CRUMRINE-HUSSEINI,**

      **Plaintiff,**

                                  **Civil Action 2:15-cv-3103**

      **v.**                              **Judge Michael H. Watson**

                                  **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Christine A. Crumrine-Husseini, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (ECF No. 17), and the administrative record (ECF No. 10).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      PROCEDURAL BACKGROUND

Plaintiff filed her applications for benefits on October 17, 2012, alleging that she has been disabled since July 15, 2007, due to amnesia caused by a head injury.  (R. at 193, 312-18, 319-24.)  Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff sought

a *de novo* hearing before an administrative law judge. After initially appearing without counsel (R. at 175-92), Administrative Law Judge Henry Wansker ("ALJ") held a supplemental hearing on July 2, 2014, at which Plaintiff, represented by counsel, appeared and testified. (R. at 136-68.) A vocational expert, Lynn Kauffman ("VE"), also appeared and testified at the hearing. (R. at 169–73.) On September 16, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 109-16.) On November 5, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.) Plaintiff then timely commenced the instant action.

## II. RELEVANT RECORD EVIDENCE

### A. Jessica Saberman, M.D.

In August 2012, Plaintiff saw primary care physician, Jessica Saberman, M.D., to establish care. (R. at 474-478.) Plaintiff reported to Dr. Saberman that she was currently serving as a full-time caregiver to her grandmother who had Alzheimer's disease. She also reported that prior to working for her grandmother, she spent the past twenty years overseas, mostly in Iraq as political analyst/economic development consultant. Plaintiff indicated that she was feeling fine and that her "only medical concern [was a] long history of eczema, most recently bothering her with a patch on her right hand." (R. at 474-75.) Plaintiff also indicated that she exercises regularly. (R. at 478.) Dr. Saberman's physical examination revealed normal findings with the exception of moderate redness and scaling of Plaintiff's skin near the base of her fourth finger on her right hand. Dr. Saberman's neurological and psychiatric examination also revealed normal findings, and Dr. Saberman described Plaintiff's mood and affect as euthymic and normal. (R. at 477.)

2

Approximately a month after her first visit with Dr. Saberman, on October 17, 2012, Plaintiff filed her applications for benefits.  (R. at 193, 312-18, 319-24.)

On October 31, 2012, approximately two weeks after filing her application for disability benefits, Plaintiff saw Dr. Saberman for her second visit.  (R. at 471-72.)  During this visit, Plaintiff reported that she was no longer living with and caring for her grandmother with Alzheimers because she had passed away.  She said that she was currently living with her mother until she could get back on her feet.  She informed Dr. Saberman that she had just discovered that she might qualify for disability benefits and had started the application process.  She told Dr. Saberman that her case manager told her that she would eventually need to see one of their specialists, but that in the meantime, she needed to talk to Dr. Saberman.  Plaintiff complained of amnesia.  She said that in the Summer of 2007, while living in Beirut, Lebanon, she "lost her memory" and could not remember where she went to school for her graduate education or what topics she studied.  Plaintiff reported that her symptoms began with a terrible pain on the top of her head followed by severe vertigo.  She said that she went to a local hospital for extensive testing, but that the tests were "unrevealing."  (R. at 471.)  Plaintiff reported that she does not remember the names of her physicians and could not get access to her records, but that her diagnosis was "Functional Amnesia."  (*Id*.)  Plaintiff told Dr. Saberman that she never regained the many of her memories.  She endorsed difficulty reading, describing the words as looking "scattered."  (*Id*.)  She also endorsed a short attention span with the exception of watching foreign films, adding that she can read subtitles as long as they appear just one line at a time.  Dr. Saberman noted that it was "interesting" that Plaintiff reported that some of these tendencies existed in childhood but were now accentuated.  (*Id*.)  Plaintiff described herself as very happy,

3

but that her emotions and reactions are sensitive.  She described good relationships with some of her family members, but not her mother because her mother's family "is very right-wing conservative and opposed to people getting 'government entitlements' such as disability benefits." (*Id.*)  Plaintiff told Dr. Saberman that she did not lose her ability to perform any of her activities of daily living or more technical abilities such as driving and writing.  Plaintiff said that she manages to drive, shop, maintain her home, and manage bills.  But she endorsed an inability to remember how long she has been in the United States and could not remember how long it had been since she last saw Dr. Saberman.  Dr. Saberman offered to refer Plaintiff to Neuropsychiatry, but Plaintiff declined, saying that she preferred to wait and see whomever she needs to for her disability application.  Plaintiff then expressed interest in meeting with people who suffer from amnesia.  (R. at 473.)

Plaintiff's date last insured ("DLI") was March 31, 2012.  (R. at 109.)

**B.    Paul Deardorff, Ph.D.**

On December 28, 2102, Plaintiff was evaluated for disability purposes by Paul Deardorff, Ph.D.  (R. at 483-89.)  Plaintiff was punctual.  When Dr. Deardorff asked why she was seeking disability, Plaintiff responded that she suffered a "head injury" in 2007, after which she lost her memory, with whole years "lost."  (R. at 483.)  Plaintiff said that at times she could remember a feeling or a color, her key and opening her office door, and her Social Security number, but that she forgets her name and date of birth.  She provided her resume to Dr. Deardorff, which reflected that Plaintiff received a Bachelor's Degree from Ohio State University and a Doctoral Degree from a British university.  Plaintiff reported that she had a "strict routine" that involved getting up at 5:00 a.m., listening to music, having breakfast, planning her day with notes,

showering, cleaning, doing work for her mind, walking to the pharmacy, doing exercises, having dinner, and going to bed at 8:00 p.m.  (R. at 484.)

On mental status examination, Dr. Deardorff found that Plaintiff could remember four digits forward, three backward, the current president, and 1 of 3 words after 5 minutes.  She could do some simple math, could count backwards, and knew historical figures from the United States.  (R. at 484.)  Plaintiff presented as mildly anxious, but described herself as "upbeat," unworried, and without suicidal ideation.  Plaintiff reported that she did not sleep well and was easily fatigued with little energy, which Dr. Deardorff noted "could be indicative of somatization."  (R. at 485.)  Plaintiff displayed no loose associations or flight of ideas, her speech was adequately organized, and conversation was easily followed.  (*Id.*)  Dr. Deardorff described her receptive language skills as adequate and noted that her "phraseology, grammatical structure, and vocabulary suggested that she was of bright-average to superior intelligence."  (*Id.*)  Plaintiff reported she did not often see family members or have friends.  Dr. Deardorff, however, observed that she acted appropriately with him.  (R. at 486.)

Dr. Deardorff found that Plaintiff "may have exaggerated her difficulties to some degree," noting she stated that although she endorsed being barely able to speak English, she was very articulate.  Dr. Deardorff also noted that her memory tests showed results in the mild to moderate range of mental retardation, yet "she presents herself as rather bright and lives independently."  (R. at 486.)  This prompted Dr. Deardorff to administer the "Rey-15 Item" test for malingering.  (R. at 487.)  The test results were suggestive of limited effort.  Dr. Deardorff further noted that her pattern of responses was "odd" and "may be suggestive of an over-endorsement of her difficulties."  (*Id*.)  Dr. Deardorff diagnosed an anxiety disorder and

dissociative disorder and he offered rule-out diagnoses of cognitive disorder and a personality disorder.  He assigned a Global Assessment of Functioning ("GAF") score of 51.  (R. at 488.)  Dr. Deardorff stated that "[a]lthough [Plaintiff] lives independently, *given her description of her inability to recall various things*, she may have difficulty managing funds prudently."  (*Id.* (emphasis added).)

**C.  Joseph A. Pressner, Ph.D.**

On January 8, 2013, after review of Plaintiff's medical record, Joseph A Pressner, Ph.D., a state-agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration.  (R. at 197.)  He further determined that the evidence did not establish the presence of the "C" criteria.  (*Id.*)  Dr. Pressner concluded that there is a "significant credibility issue in this case."  (*Id.*)  He explained that "[t]he problems described by [Plaintiff] are very atypical" and that her Rey score was indicative of poor effort.  (*Id.*)  He further explained that "the more objective information in regard to functioning is not consistent with the test scores or the subjective complaints."  (*Id.*)  Dr. Pressner also noted that although Plaintiff "purportedly cannot remember things, has poor concentration, can no longer speak two languages and can 'barely speak English," she "reported that she likes foreign films, makes her own meals, lives independently, etc."  (*Id.*)  Dr. Presser also noted that on one of the disability forms, Plaintiff reported that she does "not have a concept of time" and "yet also reported at a mental status exam that she keeps to a 'strict schedule.'"  (*Id.*)  Dr. Pressner

concluded that Plaintiff's claims were "not indicative of severe limitations despite her allegations." (*Id.*)

**D.     Brandy Matthews, M.D., and IU Health Methodist Hospital**

On February 12, 2013, Plaintiff was seen by Brandy Matthews, M.D., at the Indiana University Neuroscience Center for "amnesia." (R. at 493-96.) When Dr. Matthews asked Plaintiff to describe what happened with her head injury, Plaintiff responded that she had a sudden feeling something banged on her head, adding "although no one had hit her in the head, she did not fall, and there was no actual trauma to the head." (R. at 493.) Dr. Matthews noted that Plaintiff reported that "she was married for quite a long time, but could not tell [her] when or for what duration and what was the reason for the divorce. She added that later upon questioning with staff, Plaintiff was able to state that she was married in 1991 and that is when she moved to Lebanon because her husband was from there." (R. at 493.) Dr. Matthews noted numerous other inconsistencies, such as Plaintiff's allegation that she could not remember her childhood and later describing a "bad childhood" with verbal and physical abuse. (*Id.*) Plaintiff also said that she will get lost if she walks, but later said she is able to walk most places. (R. at 493-94.) Dr. Matthews also noted that Plaintiff was able to remember her primary care physician's name "without difficulty." (*Id.*) Dr. Matthews observed that Plaintiff demonstrated normal cognition. (R. at 495.) Upon neuropsychological screening, she concluded that Plaintiff was "generally within the range of normal with the exception of significant depressive symptomatology." (*Id.*) Dr. Matthews noted that Plaintiff was able to read sentences without difficulty and describe a picture without hesitation. Dr. Matthews found that Plaintiff's "description of her symptoms is somewhat atypical with self reports of loss of autobiographical events, immediate/recent/remote

events and [that Plaintiff] is somewhat inconsistent throughout the examination suggestive of a possible conversion or post-traumatic reaction." (*Id.*) Dr. Matthews further stated that "[t]here is some question of limited effort and inconsistency throughout the exam." (*Id.*) Dr. Matthews recommended that Plaintiff undergo an EEG and MRI.

Plaintiff underwent an EEG study on February 15, 2013, which revealed normal findings. (R. at 497.) That same day, Plaintiff also underwent an MRI due to her alleged history of dissociative amnesia, confusion, and disorientation. The radiologist assessed "[n]o acute intracranial abnormality" and found "no evidence of focal mass lesion, intracranial hemorrhage, or acute infarction." (R. at 499.)

When seen for follow-up on February 19, 2013, Dr. Matthews informed Plaintiff that "there are no structural or electrical abnormalities to account for her variable deficits in memory." (R. at 501.) She noted that Plaintiff was "very worried about her difficulty obtaining a job and her impending disability claim." (*Id.*) Dr. Matthews discussed with Plaintiff that she does not have a specific neurological diagnosis for her and suggested that she participate in psychiatric care so that she should be a candidate for vocational rehabilitation. (R. at 501.) Dr. Matthews noted that after preparation of the report from the February 19, 2013, Plaintiff requested that they not send a copy of the report to her other providers. (R. at 502.)

**E.      Sitha Gita Kalapatapu, M.D.**

The record contains a treatment note for an initial psychiatric evaluation with Dr. Kalapatapu in March 2013. (R. at 530, 532-33.) Plaintiff reported that she would like to receive treatment for her retrograde amnesia. Plaintiff reported that she forgets people that she has met and forgets conversations that she has had with people. She described herself as emotionally

confused, feeling hopeless, having the inability to communicate, and having no motivation.

Plaintiff also reported that she isolates herself, has anxiety, is frustrated and depressed, and that

she has trouble sleeping and wakes up during the night.  Plaintiff reported that she has had the

above symptoms since 2004.  (R. at 530.)  Plaintiff recalled the dates of all of her advanced

degrees during this appointment.  (*Id.*)  On mental status examination, Dr. Kalapatapu found that

Plaintiff's "memory for immediate and recent events appears to be within normal limits."  (R. at

532.)  She described Plaintiff as "alert, oriented in three spheres, cooperative, and coherent."

(*Id.*)  Dr. Kalapatapu estimated that Plaintiff's "[g]eneral knowledge, calculating ability and

intelligence" to be in the "average to above average."  (*Id.*)  Dr. Kalapatapu diagnosed

dissociative identity disorder.

**F.      Donald Layton, Ph.D.**

In April 2013, Plaintiff was examined by neuropsychologist Donald Dr. Layton, Ph.D.,

on referral from Dr. Saberman.  (R. at 535-39.)  Plaintiff reported that she suffered "some type of

closed head injury while working in Beirut, Lebanon, in 2007 when she was hit in the head by

something metallic."  (R. at 536.)  Plaintiff endorsed suffering significant amnesia and "blank

episodes" ever since.  (*Id.*)  Plaintiff used public transportation to get to the appointment and

arrived alone.  Plaintiff reported she was "abused" by a past neurologist because the neurologist

suggested she "was experiencing some psychiatric issues and that she did not have any

identifiable neurological diseases."  (*Id.*)

Dr. Layton stated that Plaintiff's "amnesia is quite unusual as she basically does not

remember much of her adulthood, [h]owever, she continues to function independently, is able to

take the bus, and manages to take care of her own daily living skills."  (*Id.*)  He noted Plaintiff

had "extensive work-up" in the past, including psychiatric, neurological, forensic, and neurodiagnostic, and that no abnormalities had been found.  (*Id.*)  Dr. Layton also noted that Plaintiff was not currently participating in any type of psychological or psychiatric therapy.  (*Id.*)  He stated that Plaintiff was "fairly dramatic in clinical presentation with regards to her various subjectively reported complaints."  (R. at 536.)  This observation prompted Dr. Layton to perform a validity test.  (R. at 536-37.)  This test revealed that Plaintiff's verbal responses were inconsistent and invalid, which Dr. Layton found to be particularly unusual given her level of education.  (R. at 537.)  Dr. Layton opined that the alleged 2007 head injury probably did not occur.  (R. at 538.)  He explained that Plaintiff's alleged symptoms were "the exact opposite" as what occurs in legitimate closed head injuries.  (*Id.*)  He added that the information that Plaintiff could not recall was also "highly unusual."  (*Id.*)  Based upon Plaintiff's responses to his personality assessment, Dr. Layton diagnosed "major depressive disorder of at least a moderate degree of severity" and opined that "[t]here may well be some underlying personality issues involved in this case as well."  (R. at 538-39.)  He therefore offered the provisional diagnoses of somatoform disorder not otherwise specified and dissociative amnesia."  (R. at 539.)

On May 2, 2013, B. Randal Horton, Psy.D., reviewed the record upon reconsideration and found Plaintiff's anxiety disorder was non-severe, that she did not have a combination of impairments that was severe, and that she did not satisfy Parts B or C of Listing 12.06.  (R. at 216-17.)  He affirmed Dr. Presser's assessment.  (*Id.*)

On May 4, 2013, state-agency physician M. Ruiz, M.D., reviewed the record as to Plaintiff's physical impairment.  Dr. Ruiz found that any alleged physical impairments were not severe.  (R. at 216.)  Dr. Ruiz noted that Plaintiff was seen by a neurologist in 2013 and that all

10

objective testing and examinations were normal.  Dr. Ruiz further noted that Plaintiff's alleged symptoms were determined to be atypical per medical staff.

**G.     Plaintiff's July 2014 Hearing Testimony**

Plaintiff testified at the July 2, 2014 administrative hearing that during the relevant period, she worked for a company that managed development projects in post-conflict areas of Iraq.  (R. at 137.)  She said that she was also a professor at the American University in Beirut, where she taught a course in politics.  (R. at 138.)  She described the institution as a "proper university," adding that "it's gorgeous, it was wonderful.  I loved my work.  I can remember that I lived such a happy life."  (R. at 138-39.)

Plaintiff testified that there was a bombing by her apartment.  (R. at 139.)  She stated that she felt a lot of pressure from the bombing.  (*Id.*)  Plaintiff said that she believes that she sustained a brain injury from being hit in the head with a metal object while in a coffee shop a few days prior to the bombing.  (R. at 139-40.)  She said she passed out and developed vertigo from the bombing.  (R. at 140.)  Plaintiff further testified that she was frequently passing out and returned home to the United States in 2009 or 2010.  (R. at 141.)  Plaintiff said when she returned, she began living with her mother and grandmother.  (R. at 141-42.)  Plaintiff represented that she suffers from dizziness, losing consciousness, and "horrible" headaches.  (R. at 143.)

Plaintiff alleges that her treating doctor, Dr. Saberman, made up information in her treatment record.  She said that she believes Dr. Saberman mixed her up with another patient. Plaintiff indicated that she has filed complaints against Drs. Saberman, Mathews, and Layton because they were not taking care of her.  (R. at 143-45.)  She stated that she was prescribed

11

Naproxen for headaches, but takes no other medications.  (R. at 149, 152.)

When asked how she spends her time during the day, Plaintiff responded that she generally does not feel well.  She said that she gets up in the morning, has a cup of coffee, and lays back down.  She added that later in the day, she will get her mail.  Plaintiff said that she can cook, but finds cleaning to be "tough."  (*Id.*)  She stated that her aunt takes her grocery shopping once per month.  She said she has a driver's license, but does not own a car.  (R. at 150.) Plaintiff indicated that she does not attend clubs or church, but hears from her overseas friends sometimes.  (R. at 151.)

## H.     ALJ's September 2014 Decision

On September 16, 2014, the ALJ issued his decision.  (R. at 109-16.)  The ALJ noted that Plaintiff met the insured status requirements through March 31, 2012.  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?
2.     Does the claimant suffer from one or more severe impairments?
3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

12

gainful activity since July 15, 2007, the alleged onset date of disability. (R. at 111.) The ALJ found that Plaintiff had the "medically determinable" impairments of a dissociative identity disorder; a somatoform disorder, not otherwise specified; a conversion disorder; an anxiety disorder; a major depressive disorder; obesity; asthma; and eczema. (*Id.*) He further found that Plaintiff does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work related activities for 12 consecutive months. He therefore concluded that Plaintiff does not have a severe impairment or combination of impairments. (*Id.*)

Following a thorough discussion of the medical evidence in the record, the ALJ found Plaintiff to lack credibility. The ALJ noted that Plaintiff's "lack of treatment is wholly inconsistent with [her] allegation of a complete inability to engage in all types of work." (R. at 115.) The ALJ also concluded that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." (R. at 113.). He found that that the record contained no evidence "to support the alleged onset date of July 15, 2007." (*Id.*)

The ALJ accepted the opinions of the state-agency reviewing physicians and psychologists, including their opinions that Plaintiff does not have a severe impairment and does not meet the Part B or C criteria for Listing 12.06. (R. at 115.) He reasoned that these physicians and psychologists "are well qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to limitations" and are "deemed to possess specific understanding of Social Security disability programs and their evidentiary requirements." (*Id.*) The ALJ also indicated that he assigned Dr. Deardorff's opinion "great

13

weight." (*Id.*)  He reasoned that Dr. Deardorff "was an examining source and well qualified because of training and experience to review an objective record and formulate an opinion as to medical severity." (*Id.*)  He added that Dr. Deardorff's opinion "was consistent with other credible opinion evidence." (*Id.*)

Finally, the ALJ noted that he reviewed the evidence "received into the record after the reconsideration determination concerning the claimant's mental status," but that it did "not provide any credible or objectively supported new and material information that would alter the State Agency's findings concerning the severity of the claimant's mental functioning." (*Id.*)

The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 116.)

I.     **Appeals Council Exhibits**

In February 2015, approximately five months after the ALJ rendered his decision, Plaintiff saw primary care physician James Ganger, M.D., with complaints of hip pain and fatigue.  (R. at 11.)  Dr. Ganger ordered a hip brace and x-rays.  He also ordered lab work to assess her fatigue.  (R. at 13.)  The hip x-ray was unremarkable.  (R. at 17.)  In addition, the lab work did not identify a medical cause for Plaintiff's fatigue.  (R. at 15-16.)

In March 2015, Plaintiff consulted with neurologist Brenden Kelley, M.D.  (R. at 29-40.) Based on Plaintiff's reported history, neurologic examination, and evaluation, Dr. Kelley opined that Plaintiff's "cognitive and behavioral changes [were] best characterized as an amnestic mild cognitive impairment." (R. at 33.)  Plaintiff underwent an MRI on May 26, 2015, which was discontinued due to Plaintiff becoming claustrophobic.  The MRI showed no evidence of any hemorrhage, midline shift, or mass lesions and no restricted diffusion to suggest any recent area

14

of ischemic change. (R. at 63.)

In October 2015, Plaintiff underwent a neuropsychological assessment with Jeffrey Madden, Ph.D., upon on referral from her attorney. (R. at 80-88.) Dr. Madden concluded that he could not ascertain whether Plaintiff sustained a significant traumatic brain injury based on his review of the records. He also stated that there were no "substantive symptoms reflecting a post-traumatic stress disorder (although that appears to be a definite possibility)." (R. at 85.) He opined that it was probable that some severely traumatic event could be linked to Plaintiff's symptoms, as the symptomatology is clearly psychotic. (*Id*.) Dr. Madden reported that the neuropsychological test scores were inconsistent, meaning that some scores may be a reliable indicator of Plaintiff's ability, but others were definitely not. Dr. Madden remarked that it is common in cases of severe mental illness that individuals do not perform consistently on neuropsychological testing. (R. at 86.) Dr. Madden further indicated that although an etiology cannot be accurately identified, he found "clear objective evidence of a severe mental impairment involving the distortion of reality." (*Id.*) He opined that this severe impairment results in the distortion of reality causing Plaintiff's somatoform (physical) symptoms, which "present significant obstacles" to Plaintiff engaging "in competitive employment." (*Id.*)

On October 26, 2015, Dr. Madden completed a mental functional capacity assessment in which he determined that Plaintiff was markedly or extremely limited in most mental work related functions. (R. at 89-91.)

### III.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

15

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IV. ANALYSIS

In her Statement of Errors, Plaintiff advances three contentions of error. (ECF No. 11.) Plaintiff first asserts that the ALJ erred in concluding that she had no severe impairments at step

two of his evaluation.  Within this contention of error, Plaintiff contends that the ALJ

erroneously relied upon the state-agency opinions, erroneously failed to consider the entirety of

Dr. Deardorff's report, and erroneously assumed that the absence of psychological treatment

meant non-severity of psychological concerns.  In her second contention of error, Plaintiff

submits that the ALJ erred in failing to evaluate whether Listing 12.07 was met or equaled.  In

her final contention of error, Plaintiff maintains that a Sentence Six remand is warranted for

consideration of new and material evidence.  The Undersigned considers Plaintiff's contentions

of error in turn.

**A.      Severe Impairment**

The Undersigned finds Plaintiff's first contention of error to be without merit.  As set

forth above, the ALJ terminated his analysis at step two based upon the absence of medical

records sufficient to establish a medically determinable impairment or combination of

impairments that is severe as contemplated under the regulations.

A severe impairment is defined as "any impairment or combination of impairments which

significantly limits your physical or mental ability to do basic work activities," 20 C.F.R. §§

404.1520(c), 416.920(c), and which lasts or can be expected to last "for a continuous period of

not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "A severe mental impairment is

'established by medical evidence consisting of signs, symptoms, and laboratory findings, not

only by [a plaintiff's] statement of symptoms.'"  *Griffith v. Comm'r*, 582 F. App'x 555, 559 (6th

Cir. 2014) (quoting 20 C.F.R. § 416.908).  Thus, if no signs or laboratory findings substantiate

the existence of an impairment, it is appropriate to terminate the disability analysis.  *See* SSR 96-

4p, 1996 WL 374187, at *2 (July 2, 1996) ("In claims in which there are no medical signs or

laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920 . . . .").  Significantly, "[n]o symptom or combination of symptoms by itself can constitute a medically determinable impairment."  SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996).  "[S]ymptoms" consist of a claimant's description of his or her alleged impairment.  20 C.F.R. § 404.1528(a).  In contrast, "signs" include "psychological abnormalities which can be observed."  20 C.F.R. § 404.1528(a)-(b).  In addition, "[p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception."  20 C.F.R. § 404.1528(a)-(b).  "Laboratory findings" include "psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques."  *Id*.  Consistently, the Sixth Circuit has advised that "[w]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology."  *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (internal quotation marks and citations omitted).  Plaintiff bears the burden of establishing the existence of a severe medically determinable impairment at step two.  *Griffith*, 582 F. App'x at 559.

Substantial evidence supports the ALJ's step-two determination.  First, the ALJ found Plaintiff's allegations of symptoms and their causes to lack credibility, a determination she does not challenge.  The ALJ's credibility assessment is supported by substantial evidence and supports his step-two finding.  As the ALJ points out, in August 2012, approximately five years after her alleged onset but prior to learning that she could seek disability benefits, Plaintiff's only

medical concern was eczema. (R. at 474-75.) Dr. Saberman's physical, neurological, and

psychiatric examinations all revealed normal findings. (R. at 477.) When Plaintiff saw Dr.

Saberman less than two months later, she endorsed amnesia, difficulty reading, a short attention

span, and sensitive emotions and reactions. Plaintiff informed Dr. Saberman that since the last

time she saw her, she discovered that she might qualify for disability benefits and had started the

application process. Dr. Saberman offered to refer Plaintiff to a specialist, but Plaintiff declined.

(R. at 473.) Plaintiff also told Dr. Saberman that she did not lose her ability to perform any of

her activities of daily living or more technical abilities such as driving and writing. Plaintiff's

representation of her continued abilities, notwithstanding her newly alleged symptoms, provides

further support for the ALJ's step-two determination. *See Rogers*, 486 F.3d at 243 n.2 (an

impairment that "minimally affects work" is not severe (internal quotation marks and citation

omitted)).

Significantly, these are the only relevant treatment records *prior* to Plaintiff's DLI. On

this point, Plaintiff challenges the ALJ's consideration of her lack of treatment as a relevant

consideration in assessing her credibility regarding her subjective complains. The ALJ reasoned

as follows:

> A lack of treatment is wholly inconsistent with [Plaintiff's] allegation of a
> complete inability to engage in all types of work and is a basis for discounting
> [Plaintiff's] subjective complaints. [Plaintiff's] failure to seek treatment during a
> claimed period of disability tends to suggest tolerable symptomatology.

(R. at 115.) The Undersigned concludes that the ALJ did not err in considering Plaintiff's lack

of treatment. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x, 719, 727 (6th Cir. 2013) (minimal

or lack of treatment is valid reason to discount severity); *Despins v. Comm'r of Soc. Sec.*, 257 F.

App'x 923, 931 (6th Cir. 2007) ("The ALJ properly considered as relevant the fact that [the claimant's] medical records did not indicate that [claimant] received significant treatment . . . during the relevant time period.") SSR 96–7p, 1996 WL 374186 (July 2, 1996) (in assessing credibility, the adjudicator must consider, among other factors, "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" and "[t]reatment, other than medication, the individual receives or has received"); 20 C.F.R. § 404.1529(c)(3) (same). *Cf. Watson v. Astrue*, No. 5:11-cv-717, 2012 WL 699788, at *5 (N.D. Ohio Mar. 1, 2012) ("If anything, the dearth of opinions cuts in the Commissioner's favor, as, in the Sixth Circuit, it is well established that . . . the claimant—and not the ALJ—has the burden to produce evidence in support of a disability claim."). Citing WebMD, Plaintiff explains that somatoform disorders "are mental illnesses that cause bodily symptoms, including pain" and that the "symptoms may or may not be traceable to a physical cause." (Pl.'s Statement of Errors 12, ECF No. 13 (citing *Web*MD, http://www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatment#1).) According to Plaintiff, her failure to seek treatment was another symptom of her somatoform disorder. The flaw in this argument is that when Plaintiff did seek treatment, she complained only of eczema and complained of other symptoms only *after* she learned that she could seek disability benefits. Regardless, Plaintiff's lack of treatment is just one of many factors the ALJ considered in assessing her credibility and arriving at his step-two determination.

Second, in addition to concluding Plaintiff's allegations lacked credibility, the ALJ reasonably relied upon the absence of any objective findings in the record in reaching his step-two determination. *See Griffith v. Comm'r*, 582 F. App'x at 559. As the ALJ pointed out, prior

to filing for disability benefits, Plaintiff complained only of eczema. The treatment records prior to Plaintiff's DLI reveal only normal physical, neurological, and psychiatric findings. (*See* R. at 475-78 (documenting normal examination findings); R. at 471-73 (documenting normal examination finding, including that Plaintiff was "[w]ell-appearing"; "[i]n no acute distress"; that "[n]o disorientation was observed"; that her mood was not elevated, depressed, or anxious; that her affect was "normal"; and assessing amnesia based upon Plaintiff's self-reported symptoms).) Objective testing conducted subsequent to Plaintiff's DLI, including MRI and EEG testing, revealed normal findings. In addition, multiple examining physicians who evaluated Plaintiff after her DLI reported normal mental status examination findings and/or concluded that Plaintiff was not credible in her presentation. (*See, e.g.*, R. at 483-89 (pointing out numerous inconsistencies in Plaintiff's allegations and concluding that she "may have exaggerated her difficulties"); R. at 493-96 (pointing out numerous inconsistencies, stating that "[t]here is some question of limited effort and inconsistency throughout the exam," and noting that neuropsychological screening revealed that Plaintiff was "generally within the range of normal"); R. at 530-33 (normal mental status examination findings); R. at 535-539 (stating that Plaintiff was "fairly dramatic in clinical presentation"; that a validity test revealed that Plaintiff's responses were inconsistent and invalid; and noting that Plaintiff "continues to function independently, is able to take the bus, and manages to take care of her own daily living skills").)

Finally, the ALJ reasonably relied upon the opinions of the state-agency physicians, who all agreed that Plaintiff did not have a severe impairment as contemplated under the regulations. The ALJ specifically concluded that the state-agency physicians' review of the Part B and C criteria for Listing 12.06 was "accepted as an accurate representation of [Plaintiff's] mental

status." (R. at 115.) As a threshold matter, as discussed above, the ALJ offered numerous bases for his step-two finding that amply supply substantial evidence even without the corroborating opinions of the state-agency physicians. Regardless, the Undersigned concludes that Plaintiff's challenges to the ALJ's reliance upon the state-agency opinions are unavailing. According to Plaintiff, the opinions of the state-agency physicians "did not constitute substantial evidence . . . in light of the entirety of the record available to the ALJ, and [because their] findings ultimately contradicted other determinations made by the ALJ." (Pl.s Statement of Errors 10, ECF No. 11.) In support of this assertion, Plaintiff points out that the ALJ identified additional non-severe impairments in his decision. But the ALJ's identification of these additional, non-severe diagnoses shows that he properly independently considered the medical record, including consideration of evidence generated after the state-agency physicians rendered their opinions. *See, e.g.*, *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (ALJ did not improperly rely upon state-agency physicians' opinions where they were out of date where it was clear the ALJ considered the medical examinations that occurred after the opinions were rendered and takes into account any changes); *Ruby v. Colvin*, No. 2:13–CV–01254, 2015 WL 1000672, at *4 (S.D. Ohio Mar. 5, 2015) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."). Moreover, the fact that the ALJ added these diagnoses does not undercut his conclusion that the state-agency physicians' assessment of Plaintiff's limitations and functional impairment was correct. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [the condition] . . . says nothing about the severity of the condition." (citation omitted)).

Plaintiff's challenges to the ALJ's consideration Dr. Deardorff's opinion also lack merit.

Plaintiff complains that the ALJ "erred by not accounting for the entirety of Dr. Deardorff's report." (Pl.s Statement of Errors 7, ECF No. 11.) Significantly, the Sixth Circuit has held that where, as here, an ALJ's decision is otherwise supported by substantial evidence, the failure to even mention a consultative, non-treating source does not constitute reversible error. *See, e.g.*, *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 839 (6th Cir. 2005) (no error where the ALJ failed to mention report of consultative neurologist who only evaluated plaintiff once and was not a treating source); *Dykes v. Barnhart*, 112 F. App'x 463, 467–69 (6th Cir. 2004) (failure to discuss opinion of consultative examiner was harmless error). Nevertheless, here, the ALJ discussed various findings of Dr. Deardorff's opinion, including noting several of the inconsistencies that Dr. Deardorff identified and his testing results that suggested Plaintiff gave limited effort. He then accorded Dr. Deardorff's opinion "great weight." (R. at 115.) Plaintiff asserts that the ALJ "declined to address a striking deficiency in Dr. Deardorff's report: nowhere did the doctor offer any assessment of [Plaintiff's] ability to perform work-related functions." (Pl.s Statement of Errors 7, ECF No. 11.) Plaintiff concludes it is therefore "unclear what the ALJ even means by giving 'great weight' to Dr. Deardorff's opinion." (*Id*.) This argument ignores that earlier in his decision, the ALJ discussed and noted his agreement with Dr. Deardorff's opinions that Plaintiff's allegations were inconsistent and that she offered limited effort. Further, the fact that Dr. Deardorff did not opine that Plaintiff had any work-related limitations supports, not undermines, the ALJ's conclusion that she does not have any severe impairments. The ALJ likewise did not err in failing to offer discussion regarding the GAF score Dr. Deardorff opined. As even Plaintiff concedes, "the Commissioner has declined to endorse the GAF score for use in the Social Security and SSI disability programs, and has indicated that

23

GAF scores have no direct correlation to the severity requirements of the mental disorders listings." *Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007) (internal quotation marks and citations omitted). Finally, the ALJ did not err in failing to address Dr. Deardorff's statement that "[a]lthough [Plaintiff] lives independently, *given her description of her inability to recall various things*, she may have difficulty managing funds prudently," (R. at 488 (emphasis added)). Dr. Deardorff explicitly premised his opinion on Plaintiff's description of her abilities. The ALJ made clear, however, that he found Plaintiff's allegations and self-reports to be not credible.

In sum, the Undersigned concludes that substantial evidence supports the ALJ's step-two determination. It is therefore **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED.**

**B.      Listing Consideration**

Within this contention of error, Plaintiff maintains that the ALJ erred in failing to evaluate whether she met or equaled Listing 12.07.

The Undersigned concludes that given the ALJ's step-two determination that Plaintiff has no severe impairments, he did not err in failing to consider whether her impairments met or equaled a Listing 12.07. 20 C.F.R. § 4041520(a)(4)(ii) ("If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."); *Colvin*, 475 F.3d at 730 ("If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.").

Moreover, the ALJ explicitly adopted the state-agency physicians' opinions that Plaintiff

did not satisfy the Part B and C criteria for Listing 12.06, which necessarily means that she does not satisfy Listing 12.07, which contains the same Part B and C criteria.

It is therefore **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED.**

## C.    Sentence Six Remand

In her final contention of error, Plaintiff asserts that remand is warranted for consideration of new and material evidence. The Undersigned disagrees.

Sentence six of 42 U.S.C. § 405(g) provides in relevant part as follows:

> The Court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42. U.S.C. § 405(g). "Sentence-six remands may be ordered in only two situations: where the Secretary requests a remand before answering the complaint, or where new, material evidence is adduced that was for good cause not presented before the agency." *Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993) (citations omitted). The requirements that the evidence be "new" and "material," and that "good cause" be shown for the failure to present the evidence to the ALJ have been defined by the United States Court of Appeals for the Sixth Circuit as follows:

> "For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' . . . Such evidence is 'material' only if there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.' . . . A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ . . . .  [T]he burden of showing that a remand is appropriate is on the claimant."

*Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

The Undersigned concludes that Plaintiff has failed to carry her burden to demonstrate that remand is warranted.  Plaintiff seeks to introduce 2015 treatment records and an October 2015 consultative evaluation.  First, as the Appeals Council pointed out, Plaintiff has failed to show that the evidence is material because it is well outside the relevant time period in light of her 2007 allege onset and March 2012 DLI.  (*See* R. at 2 ("This new information is about a later time.  Therefore it does not affect the Decision . . . .").); *Casey v. Sec'y of Health & Hum. Servs*, 987 F.2d 1230, 1233 (6th Cir. 1993) (concluding that Sentence Six remand not proper in part because the records at issue "pertain[ed] to a time outside the scope of our inquiry").  Second, Plaintiff has not advanced good cause for her failure to acquire and present such records earlier. As the Commissioner points out, Plaintiff could have sought this type of treatment anytime in the seven years between her alleged onset and the ALJ's decision.  Indeed, Dr. Saberman offered to refer Plaintiff for treatment, but she declined.  (R. at 473.)

In sum, the Undersigned concludes that Plaintiff has failed to satisfy her burden to demonstrate that remand is appropriate.  It is therefore **RECOMMENDED** that Plaintiff's third contention of error be **OVERRULED.**

## V.  CONCLUSION

From a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VI.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**

Date:  February 17, 2017                                    *s/ Elizabeth A. Preston Deavers* _____
                                                            ELIZABETH A. PRESTON DEAVERS
                                                            UNITED STATES MAGISTRATE JUDGE